**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

GIASSON AEROSPACE SCIENCE, INC., et al.,

        Plaintiffs,

v.                                Case No. 08-13667

RCO ENGINEERING, INC.,

        Defendant.

_____/

**OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

        Pending before the court is Defendant's "Motion for Partial Summary Judgment
on Count VIII, Trade Secret Misappropriation."  For the reasons below, the court will
deny Defendant's Motion.

**I.  BACKGROUND**

        Plaintiffs' claim is, in essence, a simple one: Defendants used Plaintiffs' expertise
in designing aircraft seats to secure a lucrative contract and then cut Plaintiffs out of the
deal so it would not have to share its profits.  Plaintiffs allege that in November 2007,
Defendants agreed to partner with them and pursue a contract with Gulfstream
Aerospace ("Gulfstream") to manufacture luxury aircraft seats for Gulfstream's G650
business jets.[1]  The alleged partnership was formed to allow the parties to respond to

_____

      [1]  The only facts relevant to Defendant's Motion for Partial Summary Judgment
are those related to the existence of Plaintiffs' alleged trade secrets.  To sketch the
background of the case, the court assumes Plaintiffs' version of the facts supporting its
theory that they were wrongly severed from the Gulfstream project.  These facts are
contested by Defendant, and the court has been surprised at the inordinate effort
devoted to argument over facts that were largely irrelevant to the disposition of the

Gulfstream's Request for Proposals ("RFP").  According to Plaintiffs, the gist of the agreement was that Plaintiffs would "design and engineer an aircraft cabin seat . . . and [Defendant] would build [Plaintiffs'] seat."  (Pls.' Summ. J. Resp. vii.)

Stephen Brown, a designated engineering representative ("DER"), was hired by Plaintiff to work as a subcontractor on the project with Defendant.  According to Plaintiffs, Brown was to be the "lead engineer" on the project.  (Pls.' Summ. J. Resp. Ex. 2G.)   Brown's testimony, which was given pursuant to Federal Rule of Civil Procedure 30(b)(6), is critical to the resolution of this motion.  Plaintiffs rely almost exclusively on Brown's deposition to support the alleged trade secrets.

A proposal was submitted to Gulfstream in December 2007.  (Def. Summ. J. Mot. Br. iii; Pls.' Summ. J. Resp. x.)  Plaintiffs claim that the proposal was "entirely prepared by Giasson."  (Pls.' Summ. J. Resp. x.)  After the initial proposal, called a "Technical Response," was submitted to Gulfstream, Gulfstream sent several sets of questions about the proposal to Defendant.  Plaintiffs allege that they prepared the responses to these questions, "Go Back" responses, and incorporated the Go Back responses into a modified Technical Response, which was submitted to Gulfstream in early March 2008. *Id.*

Defendant asserts that by January 2008 Gulfstream had begun staffing its own design and styling department, and that Gulfstream informed both Plaintiffs and Defendant that it may use its in-house design team for the G650 seats.  (Def. Summ. J. Mot. Br. Ex. 4. ¶¶ 7-8.)  Defendant also asserts that Gulfstream asked why Defendant

---

motions before the court.  As only one example, Plaintiffs' Response included over thirty pages of fact summary and over fifty pages of argument.  More concise briefing would have been more useful to the court, and more persuasive.

was still working with Plaintiffs.  *Id.*  Plaintiffs question the accuracy of this statement, and draw a distinction between "styling" and design.  Styling is, apparently, defining the aesthetic aspects of the seat, while design includes the structural engineering of the seat.  (Pls.' Summ. J. Resp. xi-xii.)  They argue that while it was clear that Gulfstream intended to perform styling in-house, design was to be performed by Plaintiffs and Defendant.  *Id.*  Defendant asserts that Gulfstream decided to do the design work in-house, and that it therefore continued with the Gulfstream project after informing Plaintiffs that their services were no longer necessary.  (Def.'s Summ. J. Mot. Br. iii-iv.)  In the court's view, the heart of the dispute lies here: Defendant claims that it had the right to divorce itself of Plaintiffs, but Plaintiffs assert that they had an agreement to partner with Defendant and that Defendant breached this agreement by using Plaintiffs' intellectual property and labor without giving Plaintiffs their due.

### A.  Plaintiffs' Trade Secrets[2]

In its "Motion for Partial Summary Judgement," Defendant argues that Plaintiffs do not possess any trade secrets.[3]  The parties dispute the exact nature of Plaintiffs' trade secrets.  Defendant suggests that Plaintiffs allege twenty-two separate trade secrets, (Def.'s Summ. J. Mot. Br. iv), while Plaintiffs maintain that they claim trade

---

[2]  The facts below concerning the nature of Plaintiffs' trade secrets, as stated above, are mostly from Plaintiffs' Rule 30(b)(6) representative, Brown.  Giasson's deposition as well as the Technical Responses also provides some evidence of the trade secrets.  Brown's testimony, however, is the most detailed of the evidence cited by Plaintiffs.

[3]  In its Motion Brief, Defendant also argued that, even if Plaintiffs possess trade secrets, Defendants did not misappropriate any of them.  Plaintiffs responded that they need more discovery to establish misappropriation.  In its Reply, Defendant states that it no longer wished to press this argument in this motion, (Def.'s Reply at 1, n.1), and the court will therefore not address it.

secrets in twenty-two "categories," (Pls.' Summ. J. Resp). This distinction is largely immaterial. The parties have reasonably identified the trade secrets and whether the court considers then as comprised of twenty-two secrets or twenty-two categories of secrets, at this point, appears to be a mere semantic distinction.

Plaintiffs claim as trade secrets the following:

**(1) Seat-base design.**

According to Brown, the Giasson seat base's single "monolithic" structure with its specific shape and geometry is unknown to the aircraft industry. (Brown Dep. at 93, Def.'s Summ. J. Mot. Br. Ex. 2.) The trade secret also included a new assembly process that uses "molding." (*Id.* at 97.) According to Plaintiffs, the base provides several benefits over a traditional aircraft seat base, including weight reduction, an improved assembly process, improved load distribution, less vibration and seat movement, reduced stress loads during testing, and a concomitant cost reduction in the certification process. (Brown Dep. at 90-100.)

**(2) Seat-swivel design.**

The swivel is comprised of a series of spacers, plates, and rings made of a particular type of aluminum. (Def.'s Summ. J. Mot. Br. Ex. 1 at 2.) The swivel is unique because, according to Brown, it incorporates the structure of the seat pan and seat-tracking structure. (Brown Dep. at 106-10.) The swivel also includes a locking mechanism that is similar to the rotor and caliper braking system in a car. This results in reducing stress loads, increased stability, sturdiness, and less vibration. (*Id.*)

**(3) Seat-tracking design.** The seat-tracking mechanism is a "three interlocking

4

box frame structure." (Pls.' Summ. J. Resp. Ex. 5 at 10; Brown Dep. at 116.) The structure has a specific geometry and is combined with the seat pan. (*Id.*) It allows the chair to move fore and aft as well as right and left. (*Id.*) Brown testified that the structure has several advantages, including reducing the number of parts and fasteners, improved load-bearing properties, decreased production costs, and decreased weights. (Brown Dep. at 116, 120-21, 128-29.)

**(4) Seat-pan design.**

The design is webbed netting that laces through a spring-arm structure. (Brown Dep. at 140-50.) The seat-pan has a specific geometry, a lift mechanism, and an adjuster so that its height may be adjusted to achieve the range of movements demanded by Gulfstream. (*Id.*) The structure allows a more comfortable seat with reduced weight. (*Id.*)

**(5) Leg-rest design.** The leg rest has "the capability . . . to be combined with the bottom cushion . . . . [T]he innovation is in the concealed hinge and the motion of that hinge which limits compression. . . . [T]he new hinge design has telescopic plates, allow[ing] it to move outward and up." (Brown Dep. at 180.) The leg rest also has a kick plate that slides out from under the leg rest and then moves up and outward so that the kick plate forms a level surface with the leg-rest cushion. (*Id.* at 186-87.)

**(6) Plaintiffs knowledge of "vendors, pricing, product specifications, and materials."**

This knowledge base pertains to "every aspect of the RFP technical response material and renderings relating to the seat pan and leg rest cushions." (Def.'s Summ. J. Mot. Br. Ex. 1 at 5.) Plaintiffs assert that their knowledge of specific vendors for various

components of the seat and leg-rest cushions is a trade secret.  (Brown Dep. at 35-36.)
In particular, Plaintiffs claim that Defendant was unaware of Plaintiffs' leather supplier,
Spinneybeck.  (Giasson Dep. at 174-78, Def.'s Summ. J. Mot. Br. Ex. 3.)

**(7) Passenger-restraint design.**

The trade secret is a lap-belt only design with an "inertial-reel." (Def.'s Summ. J.
Mot. Br. Ex. 1 at 5.)  This restraint system has not been employed in aircraft seating and
results in better load distribution and allows the seat height adjustments incorporated in
Plaintiffs' chair.

**(8) Armrest design.**

The armrest trade secrets include the type of composite material used to make it;
the vendor and specifications for the material; and a two-component (an upper and
lower) construction.  (Giasson Dep. at 182-89.)  Brown argues that the design yields
weight advantages and makes the armrest particularly easy to upholster.  The armrest
can retract in the seat so that its top is flush with the seat pad.  It has two support arms,
and slides in a linear track.

**(9) Backrest shell.**  This trade secret covers a design for a removable backrest
shell made of a composite material.  (Brown Dep. at 239-42.)  Its removability allows for
maintenance access and customer choice of different shapes and styles.  (*Id.*)  The
backrest's specifications also allow for a streamlined certification process so that there
is no need to certify each particular backrest.  Plaintiffs also conducted "kinematic"
studies to develop a particular backrest shape so that the seat forms a level surface
when completely reclined.

**(10) A headrest design.**

6

The design is a headrest with adjustable "wings" that can be stowed completely within the headrest.  (Brown Dep. at 270-73.)  The headrest itself can be completely stowed within the backrest and is constructed out of a molded plastic.  *Id.*  The headrest can also be adjusted forward and backward.  *Id.*  Plaintiffs assert that the headrest's stowing capabilities and composite construction are not known in the aircraft industry. *Id.*

### (11) Seat-control interface design.

The seat control trade secret is an armrest-mounted interface with a specific button layout.  (Brown Dep. at 44.)

### (12) Plaintiffs' knowledge concerning vendors of seat actuators.

Specifically, the knowledge is that a particular vendor is best situated to supply actuators with specific voltage, speed, strength, range, and load requirements. (Brown Dep. at 43-48.)  In other words, Plaintiffs claim that they discovered what supplier could best provide actuators that would meet Gulfstream's requirements.  Plaintiffs also allege that they worked with the supplier to provide features that were not available in off-the-shelf products.

### (13) Lumbar support.

Plaintiffs focus on their decision to use a pneumatic bladder lumbar support system provided by a particular vendor in combination with particular actuators.

### (14) In-seat massage.

Plaintiffs focus on their decision to use a particular vendor for the in-seat massage system.

### (15) Weight calculation.

Plaintiffs claim, as a trade secret, a detailed calculation of the weight of each seat component, including vendor-supplied components, assemblies, materials, and wiring.

**(16) Testing vendor.**

Plaintiffs claim, as a trade secret, the knowledge of a particular vendor that could perform specific testing required for the proposed Gulfstream seat.

**(17) Potential vendor for environmental control**.

Plaintiffs claim a trade secret related to the "environmental control" of the seat, i.e., a heating system and cooling system for the seat.  (Def.'s Summ. J. Mot. Br. Ex 1 at 7.)  Plaintiffs admit that the vendor of the environmental control system was not capable of providing an environmental control system when the seat was being developed.  So Plaintiffs' trade secret claim is then the knowledge of a *potential* vendor of an environmental control system.

**(18, 19) Certification and testing.**

Plaintiffs claim, as two distinct trade secrets, "Development and Certification Planning and Costing" as well as "Certification and Testing."  (Def.'s Summ. J. Mot. Br. Ex 1 at 7-8.)  Both categories of trade secrets involve Plaintiffs' specific strategies and techniques for successfully obtaining FAA certification.  The trade secrets also include cost estimates for obtaining certification.  Of particular importance, according to Brown, is utilizing three-dimensional modeling to obviate the need to produce detail drawings. It is unclear to the court why Plaintiffs consider these trade secrets as being in two different categories.  Nevertheless, for both, Brown describes information, techniques, plans, and strategies relating to the certification process.

**(20) Double-seat "envelope."**

8

Plaintiffs claim a design for a double-seat "envelope" that incorporates many of the features described above, including the tracking mechanism, the leg rest, and a design where both seats rotate in unison.

**(21) Double-seat armrest design.**

Plaintiffs claim a double-seat armrest design as a trade secret. The design is of an armrest located between two seats.  The armrest retracts so as to be level with the seat surface is unique because it has two supports, rather than one, making it more rigid.

**(22) Multi-functional seat and seat envelope.**

Plaintiffs' multi-function seat trade secrets are the "confidential and proprietary information pertaining to the multi-functional seat and seat envelope includ[ing] 2-dimensional and 3-dimensional scaled drawings."  It is unclear whether this claim is to the drawings themselves or a combination of all of the trade secret elements described above.

### B.  Plaintiffs' Disclosures of the Giasson Seat

#### 1.  Presentation to Bombardier, Gulfstream, and Defendant

On March 3, 2003, Brigitte Giasson, who largely owns and operates the two corporate Plaintiffs, met with Pierre Beaudoin, the president of Bombardier, a manufacturer of, among other things, airplanes.  Ms. Giasson presented Plaintiffs' seat-design concept to Beaudoin by showing him an animation and written materials.  The parties provided the court with a DVD of the animation, which the court has reviewed. She did not obtain a written non-disclosure agreement, but she did inform him that the

seat was proprietary.  After the presentation, Giasson left no materials with Beaudoin.
Later, Beaudoin informed Giasson that he discussed the Giasson seat with another of
Bombardier's managers and that there was no interest in the seat.

In March 2004, Giasson presented her seat concept to Gulfstream.  She
provided them with paper copies of a slide presentation and later sent them a copy of
an animation of the seat.  The parties provided the court with a DVD of the animation,
which the court has reviewed.  Before providing the animation, Plaintiffs and Gulfstream
executed a written nondisclosure agreement.

Also in March 2004, Giasson presented her seat design concept to Defendant.
Plaintiffs and Defendant executed a nondisclosure agreement before she presented the
concept to Defendant.  In September 2007, Giasson emailed her 2004 animation to one
of RCO's employees, and she included a copyright notice and a propriety information
statement.  In November 2007, Plaintiffs and Defendant executed a second
nondisclosure agreement.

## 2.  Giasson's Patents

Giasson has applied for four patents relating to Plaintiffs' alleged trade-secret
technology.  On April 17, 2003,[4] and April 29, 2003, Giasson filed applications for

_____

    [4]  Plaintiffs argue that Defendant "misstates the facts" concerning the design
patents because Defendant states that the patents were filed in 2004 rather than 2003.
Plaintiffs submitted copies of the Canadian patent applications, which indicate a filing
date of 2003.  Almost certainly, Defendant made an inadvertent mistake when it
indicated that the applications were filed in 2004 rather than 2003.  Regardless, the
dispute over the timing of the filing and public disclosures of this and the other patents
has no bearing on the court's analysis, because, as discussed below, none of the
patents disclose the technology in sufficient detail so as to interfere with Plaintiffs'
asserted trade secrets.

design patents with the Canadian patent office.  On April 30, 2003, Giasson also filed

for a design patent and a utility patent in the United States.  Plaintiffs assert that the

Canadian design patents were made public in March 2004.  On April 20, 2004,

Giasson's U.S. design patent issued and became available to the public.  On January

20, 2005, Giasson's utility patent application became public.  The utility patent

application described, in more or less detail, some of the technology covered by

Plaintiffs' alleged trade secrets.  The utility application discloses information about the

Plaintiffs' seat base:

> the seat base . . . generally comprises legs that are secured to the aircraft
> on a pair of longitudinal rails . . . integrated in the cabin floor (as standard
> practice).  The lower leg extremity . . . are generally designed to account
> for floor deformation requirements and attachment safety factors required
> by such as for example the FAA regulations.  The seat base . . . generally
> sustains the loads induced by the seat occupant during ground, flight and
> emergency landing load conditions.  Also, the exposed seat base structure
> . . . generally provides cabin openness, reduces the bulkiness of the seat .
> . . and enhances the shape of the seat and its movements.  The air
> circulation in the cabin is also better since the airflow is not blocked.

(Def.'s Summ. J. Mot. Br. Ex. 13 ¶¶ 82-83.)  The application describes a rotation and

swivel:

> the whole assembly of the seat . . . may be . . . swiveled around a
> generally vertical axis.  The . . . rotations are generally driven by the
> occupant of the seat . . . and when moved, any static position of the seat
> 10 may be positively locked.  The unlocking of the seat . . . position may
> be mechanically or electrically controlled.  The . . . rotation movements
> and the locking engagement are generally easy, smooth and silent when
> operated.

(Def.'s Summ. J. Mot. Br. Ex. 13 ¶¶ 92-93.)  The application also included a description

of the seat tracking mechanism:

> the whole assembly of the seat . . . may be displaced in translation in a
> generally horizontal plane with respect to the aircraft. . . . The translations

11

. . . are generally driven by the occupant of the seat . . . and when moved, any static position of the seat . . . may be positively locked. The unlocking of the seat . . . position may be mechanically or electrically controlled.  The translation . . . movements and the locking engagement are generally easy, smooth and silent when operated.

(*Id.*)  The application included a description of the leg rest:

[t]he positions of the seat . . . may range from an upright position such that the seat 10 faces forward . . . to a partially reclined position for in-flight operations, within a certain range, and to a fully berthed position providing a generally horizontal surface for sleeping.  It is to be noted that the legrest may also adopt a fully horizontal position for sleeping.  Between these upright and horizontal positions, the backrest may be provided with attenuated spring assisted inclination adjustment range.

(Def.'s Summ. J. Mot. Br. Ex. 13 ¶ 74.)  The application also described a passenger restraint system with a lap belt and an optional shoulder harness.  And, finally, it included a description of a headrest:

[t]he adjustable headrest . . . is manually moved by the passengers. . . . [It] includes an adjustable neck support . . . and a pair of lateral head supports . . . that are generally retractable.  The neck support . . . can be vertically adjusted separately from the lateral supports . . . and it is generally part of or mounted to the seat backrest. . . . The lateral head supports . . . generally include . . . tubular arms . . . which are . . . hinged to the seat backrest . . . , such that the lateral head supports . . . can independently pivot from their respective pivot. . . . Also, the lateral head supports . . . are generally connected together for height adjustment and can be raised up from the seat backrest . . . .

(Def.'s Summ. J. Mot. Br. Ex. 13 ¶¶ 77-81.)  The patent that issued from this application included the descriptions listed above.

## II. STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to

judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).  "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate."  *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

The court does not weigh the evidence to determine the truth of the matter, but rather, to determine if the evidence produced creates a genuine issue for trial.  *Sagan*, 342 F.3d at 497 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party must first show the absence of a genuine issue of material fact.  *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000) (citing *Celotex*, 477 U.S. at 323). The burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  He must put forth enough evidence to show that there exists a genuine issue to be decided at trial.  *Plant*, 212 F.3d at 934 (citing *Anderson*, 477 U.S. at 256).  Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson*, 477 U.S. at 251-52 (1986).

The existence of a factual dispute alone does not, however, defeat a properly supported motion for summary judgment—the disputed factual issue must be material.

13

*See id.* at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable

jurors could find by a preponderance of the evidence that the plaintiff is entitled to a

verdict—'whether there is [evidence] upon which a jury can properly proceed to find a

verdict for the party producing it, upon whom the *onus* of proof is imposed.'" (alteration

in original) (citation omitted)).  A fact is "material" for purposes of summary judgment

when proof of that fact would establish or refute an essential element of the claim or a

defense advanced by either party.  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.

1984) (citation omitted).

## III. DISCUSSION

Count VIII of Plaintiffs' complaint alleges a claim for misappropriation of trade

secrets under the Michigan Uniform Trade Secrets Act ("MUTSA").  Under Michigan's

Uniform Trade Secrets Act ("MUTSA"),

> "Trade secret" means information, including a formula, pattern,
> compilation, program, device, method, technique, or process, that is both
> of the following:
>
> (i) Derives independent economic value, actual or potential, from not being
> generally known to, and not being readily ascertainable by proper means
> by, other persons who can obtain economic value from its disclosure or
> use.
>
> (ii) Is the subject of efforts that are reasonable under the circumstances to
> maintain its secrecy.

M.C.L. § 445.1902(d); *see also Raymond James & Associates, Inc. v. Leonard & Co.*,

411 F. Supp. 2d 689, 694 (E.D. Mich. 2006).

### A.  Plaintiffs' Disclosures to Bombardier

Defendant argues that Plaintiffs' disclosures to Bombardier vitiate their trade

secret claim to seat technology developed at the time of the disclosure, because

14

Plaintiffs did not obtain a written non-disclosure agreement with Bombardier before

pitching the Giasson seat design.  In order to survive summary judgment, Plaintiffs must

demonstrate that the evidence, viewed in the light most favorable to Plaintiffs, would

allow a jury to conclude that the Plaintiffs took reasonable precautions to maintain their

trade secrets' secrecy.  *Niemi v. Am. Axle Mfg. & Holding, Inc.*, No. 269155, 2007 WL

29383, *5 (Mich. Ct. App. Jan. 4, 2007).

> The Act requires the trade secret owner to take actions that are
> "reasonable under the circumstances to maintain [the] secrecy or
> confidentiality" of its trade secret; it does not require perfection.  Whether
> the measures taken by a trade secret owner are sufficient to satisfy the
> Act's reasonableness standard ordinarily is a question of fact for the jury.
> Indeed, we previously have recognized that "only in an extreme case can
> what is a 'reasonable' precaution be determined [as a matter of law],
> because the answer depends on a balancing of costs and benefits that will
> vary from case to case."[5]

*Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 725 (7th Cir. 2003),

*cited in Niemi v. NHK Spring Co., Ltd.*, 543 F.3d 294 (6th Cir. 2008) and *Niemi*, No.

269155.

Here, Plaintiffs have produced sufficient evidence to allow a jury to conclude that

reasonable precautions were taken to maintain secrecy in spite of the presentation to

Bombardier.  Defendant is correct in that there is no evidence on the record suggesting

that Plaintiffs obtained a written disclosure from Bombardier.  In fact, the record only

---

[5]  Although this quote is from a Seventh Circuit case interpreting the Illinois
Uniform Trade Secrets Act, section 9 of the MUTSA requires that the Act "be applied
and construed to effectuate its general purpose to make uniform the law with respect to
the subject of th[e] act among states enacting it."  Mich. Comp. Laws § 445.1909.
Decisions of other jurisdictions therefore have particular persuasive import.  *See, e.g.*,
*Power Press Sales Co v. MSI Battle Creek Stamping*, 604 NW.2d 772 (Mich. Ct. App.
1999).

indicates that Giasson informed Bombardier that the materials were "proprietary." (Giasson Dep. at 144.)  Plaintiffs stress that an oral nondisclosure agreement is, in some cases, a reasonable precaution to maintain secrecy.  Given the fact-specific nature of the reasonable precautions inquiry, the court agrees.  But it is not entirely clear that Giasson even made a oral agreement with Bombardier.  The evidence only suggests that Giasson unilaterally informed Bombardier that the materials were "proprietary."  This statement could have easily been interpreted by Bombardier to mean that the materials were patented rather than trade secrets.  Nevertheless, given the *nature of the disclosure* to Bombardier, a jury could conclude that Plaintiffs took reasonable precautions to maintain secrecy.  Giasson stated that she did not "show [Bombardier] the details."  *Id.*  This assertion is consistent with the animation itself, which only shows the exterior of the chair while progressing through the range of its movements.  This type of presentation poses little risk of disclosing Plaintiffs' trade secrets.  For example, the seat tracking system described by Plaintiffs is not even visible during the animation; nor is the geometry of the seat base, the seat pan structure, the passenger restraint system's inertial wheel, etc.  Moreover, Giasson showed Bombardier the animation only "a few times," and she left no materials behind, *id.* at 143; thus, preventing Bombardier from studying the materials.   The fact that Plaintiffs are a relatively small operation also supports their argument that they took reasonable precautions.  The precautions that are reasonable for a large commercial organization may be unreasonable for a smaller operation depending on the required cost benefit analysis.  Plaintiffs have produced sufficient evidence to allow a jury to find reasonable precautions to maintain secrecy during the Bombardier presentation.

## B.  The Giasson Patents

Defendant also maintains that the disclosures in Giasson's various patents disqualify many of Plaintiffs' asserted trade secrets.  Specifically, Defendant argues that the disclosures regarding the seat base, the seat tracking system, the leg rest, the restraint system, and the head rest prohibit Plaintiffs from claiming trade secrets based on that technology.

> The law is clear that information in the public domain by way of a patent can no longer be a trade secret. "If a trade secret is patented there is no further right to secrecy. The patent is a legal disclosure with the right to a limited, temporary monopoly granted as the reward for disclosure." "When the patent was granted, [the plaintiff]'s property right in the trade secret ceased prospectively. Thus, he had no right of action for misuse of a trade secret subsequent to that date."

*Hickory Specialties, Inc. v. Forest Flavors International, Inc.*, No. 99-5003, 2000 WL 687681, 5 (6th Cir. 2000) (quoting *Scharmer v. Carrolton Mfg. Co.*, 525 F.2d 95, 99 (6th Cir. 1975)).  Defendant points out similarities between some of Plaintiffs' trade secrets and the disclosures in the patents, and argues that these similarities invalidate four of Plaintiffs' trade secrets.  The patents[6] do not, however, disclose the salient features of the asserted trade secrets.  According to Brown, the seat-base trade secret includes the specific geometry and the molding and construction process used to manufacture the base.  The patent only discloses an open, monolithic seat base in broad terms.  The passenger-restraint trade secret, again according to Brown, includes an inertial reel, of

---

[6]  In spite of listing the three design patents in the facts section of its brief, Defendant does not rely on them in its argument that Plaintiffs' trade secrets are invalid because of public disclosure.  Instead, Defendant appears to rely solely on the disclosures in the utility patent and application.  Indeed, the design patents relate to the ornamentation and styling of the seat rather than the engineering, which is the subject of the Plaintiffs' asserted trade secrets and utility patent.

which there is no mention in Giasson's patents.  The seat-swivel trade secret involves incorporating the swivel into the seat pan and seat-tracking structure.  The patent does not mention this feature.  And, finally, the headrest trade secret covers a headrest that completely stows inside of the backrest, is constructed out of a particular composite material, and has a particular range of forward and backward movement.  The patent does not disclose these headrest features.  The utility patent, as argued by Plaintiffs, claims, discloses, and enables a folding-table invention.  The patent claim is limited by including various other features of an aircraft seat and includes brief descriptions of these features.  But it comes far short from disclosing Plaintiffs' trade secrets in sufficient detail such that no reasonable jury could find for Plaintiffs on the secrecy element of a trade secret claim.

### C.  Readily Ascertainable from Technology in the Public Domain

According to Defendant, although none of the asserted trade-secret designs completely existed in the public domain, the seat-tracking, headrest, and armrest trade designs were "readily ascertainable" from what existed in the public domain.

There can be no trade secret where the "secret" is readily ascertainable from the public domain.  But Plaintiffs need not show that each component of their trade secrets are secret, or even nonobvious over what exists in the public domain.  In holding that "based on a unique combination of both protected and unprotected material, a plaintiff

should not be obligated to identify which components of the protected material is
secret," the Sixth Circuit relied on a string of cases that stand for the proposition that a
trade secret can exist in a combination of characteristics each of which, by itself, is in
the public domain.  *Mike's Train House, Inc. ("MTC") v. Lionel, L.L.C.*, 472 F.3d 398,
411 (6th Cir. 2006).  The *MTC* court relied on, in particular, the Seventh Circuit's
reasoning:

> In order to be considered a trade secret, a pattern, technique, or process
> need not reach the level of invention necessary to warrant patent
> protection. A trade secret can exist in a combination of characteristics and
> components, each of which, by itself, is in the public domain, but the
> unified process, design and operation of which, in unique combination,
> affords a competitive advantage and is a protectable secret.

*3M v. Pribyl*, 259 F.3d 587, 596-97 (7th Cir. 2001).  The Sixth Circuit found this
reasoning consistent with Michigan law: "under Michigan law a new combination of
known steps or processes can be entitled to trade-secret protection."  *MTC*, 472 F.3d at
411.

Here, Plaintiffs have produced sufficient evidence to allow a jury to conclude that
the seat-tracking, headrest, and armrest trade secrets were protectable trade secrets
even though some of the components were in the public domain.  Regarding the seat-
tracking trade secret, Defendant points to no evidence suggesting that Plaintiffs' triple
nested box design was in the public domain.  Defendants, instead, argue that the
design is readily ascertainable because combined lateral and longitudinal tracking was
common in the industry, and that the wheel and rail system used in Plaintiffs' seat-
tracking design is a standard design choice.  But Plaintiffs' design is sufficiently different
from the technology described in the public domain, e.g., U.S. Patent No. 7,108,325

19

(Def.'s Partial Summ. J. Br. Ex. 18), that a reasonable jury could find that the design is not readily ascertainable.  The nested-box structure, the addition of the wheels and rails, and incorporating the seat pan structurally, are all elements not present in the public domain.  Accordingly, the evidence produced by Plaintiffs is sufficient to survive summary judgment on the question of whether Plaintiffs' seat-tracking design was a unique combination of known elements affording it a competitive advantage.

Defendant also claims that Plaintiffs have no trade secret concerning the headrest design because an existing headrest on DeCrane aircraft seats had similar features.  But even a casual glance at the public DeCrane headrest demonstrates that it is utterly dissimilar to the design claimed as a trade secret by Plaintiffs.  As Plaintiffs point out, the DeCrane headrest does not have wings that stow behind the headrest nor does it have the capability of sliding down into the backrest completely.  These features are integral features of Plaintiffs' headrest.  Defendant also claims that the Plaintiffs have no armrest trade secret because of a retractable armrest described in a patent owned by Airbus.  Plaintiffs argue that the patent does not describe key components of their armrest trade secret.  Plaintiffs' armrest trade secret is quite similar to that described in the Airbus patent.  Both can be retracted so that they are flush with the seat's surface.  The Airbus arm slides on two rails, and Plaintiffs' armrest has two support arms and a linear track.  According to Giasson's deposition, however, the two-component structure of Plaintiffs' armrest is one of its critical features, a feature not present in the Airbus armrest.  The issue of whether Plaintiffs' armrest design, seat-tracking system, and headrest are readily ascertainable from the public domain is therefore a question properly submitted to a jury.

20

2:08-cv-13667-RHC-PJK   Doc # 122   Filed 01/22/10   Pg 21 of 24   Pg ID 4788

**D.  Vendor Lists**

Defendant argues that Plaintiffs have no trade secrets based on the identity of vendors and pricing because the vendors were known to the aviation industry. Knowledge of vendors, vendor capabilities, and pricing can be a trade secret even if all of the information can be obtained through publicly available means so long as the information is not readily ascertainable.  *See Wysong Corp. v. M.I. Industries*, 412 F. Supp. 2d 612, 630 (E.D. Mich. 2005).  "Information concerning the capabilities and know-how of the suppliers is valuable." *Id.*  The Michigan Supreme Court held that knowledge of vendors was a trade secret where "[a p]laintiff experimented with materials and solutions to determine how to make the best product at the cheapest cost." *Hayes-Albion v. Kuberski*, 364 N.W.2d 609, 614 (Mich 1984).  Plaintiffs produced evidence that their vendor trade secrets are not limited to the names of particular vendors but include knowledge of which vendors are the best sources for particular products.  Brown testified that he defined the requirements for particular seat components and then researched vendors to determine whether that particular vendor had the best solution.  For example, Brown stated "[a]s part of the evaluation of the [seat-actuator] vendor, I had to define the requirements for those actuators, their speed, their strength, . . . and certification requirements associated to those actuators."  (Def. Summ. J. Mot. Br. Ex. 2 at 45.)  In at least one case, Brown worked with a particular vendor to customize the vendor's products.  Plaintiffs have therefore produced sufficient evidence to submit the question of whether their vendor knowledge was a trade secret.

**E.  Certification Strategy**

21

Defendant argues that Plaintiffs do not have a certification-strategy trade secret, because it "would be similar in many respects" to the steps taken by any DER going through the FAA certification process.  (Def.'s Summ. J. Mot. Br. 11.)  But Brown testified that Plaintiffs' certification trade secrets include the use of three-dimensional modeling, included a detailed time line for testing and certification of the seat's various components, and identified key tests that were the most critical and likely to result in certification failure.  Further, Brown testified that the three-dimensional modeling had not been used in a certification process before.  Defendant's argument must be rejected, because Brown's testimony—if believed—supports the conclusion that Plaintiffs' certification strategy was not known in the aviation community or readily ascertainable from information in the public domain.


### F.  Independent Economic Value

Defendant also argues that Plaintiffs have failed to establish that their trade secrets derive economic value from being secret.  To have independent economic value "the secret information must afford the owner a competitive advantage by having value to the owner and potential competitors."  *Dailer-Chrysler Servs. N. Am., LLC v. Summit Nat'l, Inc.*, 289 F. App'x 916, 922 (6th Cir. 2008); *see also Mike's Train House*, 472 F.3d at 410-11.  In other words, information has independent economic value if it "would be useful to a competitor."  *Id.* (citing *U.S. West Commc'n, Inc. v. Office of Consumer Advocate*, 498 N.W.2d 711, 714 (Iowa 1993).  The Minnesota Supreme Court, one of

22

the first states to interpret the "independent economic value" element of the Uniform Trade Secrets Act, held that secret information has independent economic value "[i]f an outsider would obtain a valuable share of the market by gaining [the] information." *Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 900 (Minn. 1983).

Plaintiffs have produced enough evidence to allow a jury to conclude that their alleged trade secrets have independent economic value.  Plaintiffs' trade secrets consist of, more or less, three types of secret information: (1) designs for various components of an aircraft seat; (2) vendor product and pricing information; and (3) a certification plan.  Brown's testimony contains numerous descriptions of how Plaintiffs' designs represent advances over the existing technology.  Plaintiffs have produced evidence that their designs were part of the reason that Gulfstream awarded the contract to Defendant.  A jury could find that the designs had independent economic value from being secret because they would be of value to a competitor who could have used them to help secure the contract from Gulfstream.  *See Appalachian Railcar Servs., Inc. v. Boatright Enter.*, 602 F. Supp. 2d 829, 853 (E.D. Mich. 2008) (information had independent economic value because competitor could have used it to craft a bid that would have had a better chance of winning a contract).  Likewise, Brown's testimony, if believed by a jury, is sufficient to allow a finding that the information about vendors and certification has independent economic value because it would be of use to a competitor proposing a new aircraft seat in a bidding competition as well as a manufacturer attempting to certify and produce a new seat.  Moreover, Brown's testimony also supports the independent economic value element in that a manufacturer could produce seats incorporating Plaintiffs' designs and be the first on

23

the market to offer seats with new advances.  Regardless of whether the technology

could be reverse-engineered just by looking at the seats, keeping the designs a secret

would still provide economic value because it would take time for a competitor to

produce and certify comparable designs.  Defendants argue that the trade secrets have

no independent economic value because Plaintiffs' technology has not been "tested or

proven."  Independent economic value, however, does not require that the designs be

completely refined, developed, and manufactured.  *See Learning Curve*, 342 F.3d at

726-27.  Brown's testimony, if believed, is sufficient to allow a finding that Plaintiffs'

designs are feasible and represent advances over the existing technology.  Accordingly,

Plaintiffs have produced sufficient evidence to allow the question of economic value to

proceed to a jury.


### III.  CONCLUSION

IT IS ORDERED that Defendant's "Motion for Partial Summary Judgment" [Dkt. #

79] is DENIED.

       S/Robert H. Cleland
      ROBERT H. CLELAND
      UNITED STATES DISTRICT JUDGE

Dated:  January 22, 2010

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, January 22, 2010, by electronic and/or ordinary mail.

       S/Lisa G. Wagner
      Case Manager and Deputy Clerk
      (313) 234-5522